# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MICHEAL McCARRELL**<br><br>**and**<br><br>**DANIEL SCHULTZ**<br>**20675 Cove Road**<br>**Bivalve, Maryland 21814**<br>*Plaintiffs*,<br><br>v.<br><br>**MICHAEL P. BETLEY**<br>**403 Viola Court**<br>**Bel Air, Maryland 21015**<br><br>*Defendant*. | **Case No. 1:23-cv-02781-JRR** |

## SECOND AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Micheal McCarrell and Daniel Schultz by and through their attorneys, Michael Paul Smith and Melissa L. English, of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney and Veronica B. Nannis of Joseph, & Greenwald and Laake, P.A., file this Second Amended Class Action Complaint on behalf of themselves and on behalf of the entire class of persons similarly situated, suing the Defendant Michael P. Betley for cause and damages, and state as follows:

## INTRODUCTION

1.    Plaintiffs Michael McCarrell and Daniel Schultz ("Plaintiffs"), and the alleged Class Members, are borrowers who currently have or had a residential mortgage loan originated and/or brokered by MBA Mortgage Services, Inc. ("MBA"), which was or is secured by Plaintiffs' and Class Members' residential real properties.

2.    Plaintiffs and alleged Class Members are victims of an illegal kickback agreement ("Kickback Agreement") between MBA and All Star Title, Inc. ("All Star"), a Maryland-

1

based title and settlement services company, and a related scheme to defraud ("Scheme to Defraud") borrowers into paying fraudulent charges for title and settlement services, carried out through the use of the interstate U.S. mails.

3.     Under the kickback agreement, Defendant Michael P. Betley, MBA's president and sole shareholder ("Betley"), as well as MBA branch managers, loan officers, agents, and/or other employees acting on Betley's direction, received and accepted illegal kickbacks in exchange for the selection and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*  These kickbacks were paid pursuant to a quid pro quo agreement for kickbacks in exchange for the referral of MBA borrowers to All Star.  Neither Betley, MBA, nor any MBA employee and/or agent receiving the kickbacks performed any title or settlement services associated with the kickbacks.

4.     Betley and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the Kickback Agreement.

5.     To pay for the kickbacks, Betley and All Star form an association in fact enterprise and implement a scheme to defraud borrowers into paying fraudulent and unnecessarily increased charges for title and settlement services, including amounts charged for the sole purpose of funding the illegal kickbacks, thereby defrauding borrowers into bearing the cost of the illegal enterprise.

6.     MBA, through Betley, chose to reinvest the illegal kickbacks into the scheme to defraud, using the illegal kickbacks to produce and send through the U.S. mail tens of thousands of fraudulent direct mail solicitations to lure borrowers into the scheme to defraud, engaging in a continuous pattern of racketeering activity for a period of at least five years in violation

2

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

7.     Betley, MBA and All Star fraudulently concealed the Kickback Agreement and Scheme to Defraud by laundering the illegal kickbacks through third-party marketing companies, creating sham invoices and payment records, making fraudulent representations in marketing materials, the false allocation of title and settlement fees and manipulation of the Annual Percentage Rate ("APR") associated with MBA loans, and making false and fraudulent representations and omissions in MBA borrowers' loan documents. These concealments prevented borrowers, regulators, and auditors from discovering the kickback agreement, scheme to defraud, and the injuries to MBA borrowers, including Plaintiff and Class Members, therefrom, and allowing the kickbacks and racketeering activity to continue.

## PARTIES

8.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.     Plaintiff Micheal McCarrell is a resident of Rochester, New York.

10.    Plaintiff Daniel Schultz is a resident of Wicomico  County, Maryland.

11.    Defendant Michael P. Betley is a resident of Harford County, Maryland.  At all relevant times, Betley was a licensed mortgage broker and was the President and sole shareholder of MBA Mortgage Services, Inc. ("MBA").  At all relevant times, MBA was and is a corporation organized under the laws of Maryland, with its headquarters and principal office located in Bel Air, Harford County, Maryland. MBA is engaged in the business of consumer mortgage brokering, origination, lending, and/or otherwise transacting business in the state of Maryland and other states.

3

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

13.    This Court has personal jurisdiction over the parties.  Personal jurisdiction over Betley is appropriate because during the time period alleged herein Betley continuously transacted business within this District and engaged in an illegal price fixing agreement to fix prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District. In addition, Betley resides in this District and currently transacts business within this District.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and 18 U.S.C. §1965 (a) because Betley is subject to personal jurisdiction in this District and a substantial part of the conduct, events, and omissions giving rise to Plaintiffs' and the Class Members' claims occurred within this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

15.    At all relevant times, All Star Title, Inc. ("All Star") is a Maryland corporation and a title and settlement service provider, licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than thirty states and provides title and settlement services on residential mortgage loans, refinances, and reverse mortgages secured by real property in forty-seven states.

**I.     Beginning in July, 2009, and continuing through 2015, MBA receives and accepts more than a quarter of a million dollars in illegal kickbacks.**

16.    Beginning by at least 2009, All Star has entered an agreement ("Kickback Agreement") with Betley to pay Betley, MBA, and MBA's brokers, loan officers, and other employees,

kickbacks in exchange for Betley's and MBA's selection and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services.

17.    At all relevant times, MBA's brokers, loan officers, and employees who received and accepted kickbacks were licensed mortgage brokers and/or authorized loan officers and were acting under the direction of Betley, and on behalf of MBA within scope of the business relationship and duties of their employment on behalf of MBA, seeking borrowers and originating and securing loans for residential mortgages through MBA and/or brokering such loans through MBA to other lenders with whom MBA authorizes, referring MBA borrowers to title companies, and working with title companies to close these loans. All activities, including any interaction with All Star, were for the benefit of Betley and MBA.

18.    As an integral part of the Kickback Agreement, All Star and Betley, agree to launder the kickbacks through third party marketing companies. Ex. 1, Jan. 15, 2010 e-mail from Betley to MBA loan officers.

19.    All Star does not regularly use marketing companies for marketing services, nor does All Star directly solicit borrowers. In contrast, Betley, MBA and/or MBA's loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing, or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages from MBA.

20.    Under the Kickback Agreement, Betley and MBA identify a third-party marketing company that MBA is using for its marketing services. All Star then makes the kickbacks to the third-party marketing company, and Betley and MBA receive and accept the

kickbacks when the third-party marketing company applies All Star's payment for the benefit of MBA and for the services that MBA is receiving. Ex. 2, Jan. 26, 2010 e-mail from Betley to All Star.

21. All Star's payment laundered through the third-party marketing company is an express payment for the benefit of Betley and MBA for the selection and referral of MBA loans under the Kickback Agreement and not a payment to the third-party marketing company for legitimate marketing services; in fact, All Star receives no marketing services from the third-party marketing company.

22. The kickbacks start with the selection and referral of loans from MBA loan officer Rob Selznick, who in late 2009 leaves to work for All Star as a Senior Account Manager. Betley takes over and directs MBA's participation in the kickback agreement and scheme to defraud.

23. From 2009 through 2010, All Star pays, and Betley receives and accepts, $58,646.94 kickbacks for the selection and referral of MBA loans from MBA. These kickbacks are laundered by and through various third-party marketing companies, including:

   a. $4,380.00 kickback on July 31, 2009, laundered by and through Lendanear Data & Direct Mail Services ("Lendanear"), a Tennessee-based direct mail provider;

   b. $9,250.00 kickback on January 26, 2010, laundered by and through Keary Advertising ("Keary"), a Maryland-based direct mail provider;

   c. $520.00 kickback on March 2, 2010, laundered by and through Lendanear;

   d. $560.00 kickback on March 17, 2010, laundered by and through Lendanear;

   e. $400.00 kickback on March 23, 2010, laundered by and through Lendanear;

   f. $400.00 kickback on April 8, 2010, laundered by and through Lendanear;

g. $2,700.00 kickback on April 9, 2010, laundered by and through Jemco Graphic

Services, Inc. ("Jemco"), a Maryland-based direct mail provider;

h. $12,500.00 kickback on April 22, 2010, laundered by and through Jemco;

i. Unknown kickback amount on June 9, 2010, laundered by and through Tranzact;

j. $4,990.00 kickback on July 9, 2010, laundered by and through Lendanear;

k. $3,120.00 kickback on September 3, 2010, laundered by and through Jemco;

l. $5,053.10 kickback on September 20, 2010, laundered by and through Jemco;

m. $2,080.00 kickback on or about September 20, 2010, laundered by and through

Jemco;

n. $5,980.00 kickback on October 8, 2010, laundered by and through Jemco;

o. $3,045.20 kickback on October 19, 2010, laundered by and through Jemco;

p. $5,040.00 kickback on November 5, 2010, laundered by and through Jemco;

q. $3,008.64 kickback on November 5, 2010, laundered y and through Jemco.

24.    All Star's laundering of payments through Lendanear, Jemco, Tranzact and Keary are for

the benefit of Betley and MBA, and are express payments for the referral of MBA loans

by MBA to All Star and to conceal the illegal kickbacks, and not for any of these companies

providing of any goods or services to All Star.

25.    Betley required all of MBA's loan officers and/or employees to select and refer loans to

All Star for title and settlement services pursuant to the Kickback Agreement. Betley

memorialized this requirement in an e-mail to MBA's employees, stating: "We have struck

a deal with Allstar Title to offset some of the expenses for each of these [mailer] drops for

January and February. Since we have setup this relationship for the next two months ALL

loans that are generated through in-house marketing or advertising MUST go to Allstar

title" and that "[t]here are no exceptions". Ex. 1.

26.    In 2011, All Star pays, and Betley receives and accepts, $57,921.77 kickbacks for the selection and referral of MBA loans from MBA.  These kickbacks are laundered by and through various third-party marketing companies, including:

    a.    $1,483.69 kickback on January 6, 2011, laundered by and through Lendanear;

    b.    $440.00 kickback on January 7, 2011;

    c.    $1,140.00 kickback on February 3, 2011, laundered by and through Lendanear;

    d.    $1,687.51 kickback on March 2, 2011, laundered by and through Tranzact;

    e.    $1,236.00 kickback on March 3, 2011, laundered by and through Lendanear;

    f.    $6,180.00 kickback on March 3, 2011, laundered by and through Lendanear;

    g.    $3,167.62 kickback on April 1, 2011, laundered by and through Lendanear;

    h.    $472.51 kickback on May 6, 2011, laundered by and through Tranzact;

    i.    $1,766.45 kickback on May 6, 2011, laundered by and through Lendanear;

    j.    $337.50 kickback on May 24, 2011, laundered by and through Tranzact;

    k.    $1,261.75 kickback on May 25, 2011, laundered by and through Lendanear;

    l.    $4,500.00 kickback on July 28, 2011, laundered by and through Lendanear;

    m.    $4,731.56 kickback on August 3, 2011, laundered by and through Lendanear;

    n.    $4,723.79 kickback on September 8, 2011, laundered by and through Lendanear;

    o.    $4,037.60 kickback on October 4, 2011, laundered by and through Lendanear;

    p.    $4,542.30 kickback on October 11, 2011, laundered by and through Lendanear;

    q.    $4,731.56 kickback on November 4, 2011, laundered by and through Lendanear;

    r.    $6,750.36 kickback on November 23, 2011, laundered by and through Lendanear;

    s.    $4,731.57 kickback on December 29, 2011, laundered by and through Lendanear.

27.    All Star's laundering of payments through Lendanear and Tranzact are for the benefit of Betley and MBA and are express payments for the selection and referral of MBA loans by

MBA to All Star and to conceal the illegal kickbacks, and not for any of these companies providing any goods or services to All Star.

28.  In 2012, All Star pays, and Betley receives and accepts, $75,183.76 kickbacks for the selection and referral of MBA loans from MBA. These kickbacks are laundered by and through various third-party marketing companies, including:

    a.  $6,450.57 kickback on February 1, 2012 laundered by and through Lendanear;

    b.  $6,501.86 kickback on March 1, 2012, laundered by and through Lendanear;

    c.  $6,501.86 kickback on March 29, 2012, laundered by and through Lendanear;

    d.  $6,501.86 kickback on May 2, 2012, laundered by and through Lendanear;

    e.  $1,675.37 kickback on May 7, 2012, laundered by and through Lendanear;

    f.  $6,501.86 kickback on May 30, 2012, laundered by and through Lendanear;

    g.  $6,501.86 kickback on July 2, 2012, laundered by and through Lendanear;

    h.  $6,501.86 kickback on July 31, 2012, laundered by and through Lendanear;

    i.  $1,039.20 kickback on or about August 10, 2012, laundered by and through Lendanear;

    j.  $6,501.86 kickback on or about August 30, 2012, laundered by and through Lendanear;

    k.  $6,501.86 kickback on September 26, 2012, laundered by and through Lendanear;

    l.  $6,501.86 kickback on or about October 23, 2012, laundered by and through Lendanear;

    m.  $1,040.30 kickback on November 13, 2012, laundered by and through Lendanear;

    n.  $1,000.00 kickback on or about November 13, 2012;

    o.  $5,461.58 kickback on December 20, 2012, laundered by and through Lendanear.

29.     All Star's laundering of payments through Lendanear are for the benefit of Betley and

        MBA and are express payments for the selection and referral of MBA loans by MBA to

        All Star and to conceal the illegal kickbacks, and not for Lendanear providing any goods

        or services to All Star.

30.     In 2013, All Star pays, and Betley receives and accepts, $63,841.35 kickbacks for the

        selection and referral of MBA loans from MBA. These kickbacks are laundered by and

        through various third-party marketing companies, including:

        a.  $5,773.67 kickback on January 10, 2013, laundered by and through Lendanear;

        b.  $2,363.85 kickback on February 12, 2013, laundered by and through Lendanear;

        c.  $4,202.40 kickback on February 13, 2013, laundered by and through Lendanear

        d.  $1,696.72 kickback on February 19, 2013, laundered by and through Lendanear;

        e.  $4,155.53 kickback on March 5, 2013, laundered by and through Influence Direct,
            a Tennessee-based direct mail provider;

        f.  $4,202.40 kickback on March 6, 2013, laundered by and through Lendanear;

        g.  $4,150.40 kickback on April 5, 2013, laundered by and through Lendanear;

        h.  $1,707.75 kickback on April 9, 2013, laundered by and through Influence Direct;

        i.  $4,149.60 kickback on May 8, 2013, laundered by and through Influence Direct;

        j.  $2,242.00 kickback on Mary 8, 2013, also laundered by and through Influence
            Direct;

        k.  $1,140.00 kickback on May 9, 2013, laundered by and through Influence Direct;

        l.  $2,844.87 kickback on May 9, 2013, also laundered by and through Influence
            Direct;

        m.  $4,275.00 kickback on May 31, 2013, laundered by and through Influence Direct;

        n.  $4,199.76 kickback on July 1, 2013, laundered by and through Influence Direct;

10

o. $750.00 kickback on or about July 9, 2013, laundered by and through Azevedo Solutions Group ("Azevedo"), a California-based direct mail provider;

p. $1,054.50 kickback on July 11, 2013, laundered by and through Influence Direct;

q. $1,023.55 kickback on July 17, 2013, laundered by and through Influence Direct;

r. $600.00 kickback on or about July 31, 2013, laundered by and through Azevedo;

s. $4,199.75 kickback on July 31, 2013, laundered by and through Influence Direct;

t. $760.00 kickback on August 30, 2013, laundered by and through Best Rate Referrals ("Best Rate"), a Nevada-based direct mailing and marketing company;

u. $4,149.60 kickback on September 18, 2013, laundered by and through Influence Direct;

v. $4,200.00 kickback on October 30, 2013, laundered by and through Influence Direct.

31.     All Star's laundering of payments through Lendanear, Influence Direct, Azevedo, and Best Rate are for the benefit of Betley and MBA and are express payments for the selection and referral of MBA loans by MBA to All Star and to conceal the illegal kickbacks, and not for any of these companies providing any goods or services to All Star.

32.     From 2014 through 2015, All Star pays, and Betley receives and accepts, $1,762.00 kickbacks for the selection and referral of MBA loans from MBA. These kickbacks are laundered by and through various third-party marketing companies, including:

a. $800.00 kickback on November 7, 2014, laundered by and through Monster Lead Group ("Monster Lead"), a Maryland-based leads and direct mail company;

b. $481.00 kickback on November 21, 2014, laundered by and through Monster;

c. $481.00 kickback on February 18, 2015, laundered by and through Monster.

33.    All Star's laundering of payments through Monster Lead are for the benefit of Betley and MBA, are expressly payments for the selection and referral of MBA loans by MBA to All Star and to conceal the illegal kickbacks, and not for Monster Lead providing any goods or services to All Star.

34.    No good, facilities, or services are provided by Betley, MBA or any MBA employees and/or agents, associated with the receipt and acceptance of any kickback.  The payment by All Star and the receipt and acceptance by Betley and MBA of the kickbacks is made expressly and solely for the selection and referral by Betley and MBA of MBA borrowers to All Star.

35.    Based on the continuing pattern of practice between All Star, Betley, and MBA, Plaintiffs believe, and therefore aver, that All Star paid, and Betley and MBA received, kickbacks in exchange for Betley's and MBA's selection and referral of loans from additional known and unknown MBA loan officers, in furtherance and performance of the Kickback Agreement, including but not limited to Gary Fischer, David Vach, Brad Hyson, and Andrew Tsottles. Ex. 2; Ex. 3, Nov. 6, 2009 e-mail re kickbacks to Brad Hyson.

36.    Based on the continuing pattern of practice between All Star, Betley, and MBA, Plaintiffs believe, and therefore aver, that All Star paid kickbacks to Betley and MBA by and through other third-party marketing companies in addition to those identified herein.

**II.    Betley, MBA and All Star erect an elaborate sham to conceal the kickbacks and to later try to claim that the kickback payments were "co-marketing" protected by 12 U.S.C. §2607(c)(2).**

37.    Concealment from borrowers, regulators and auditors is essential to the success and continuation of the Kickback Agreement and the illegal kickbacks.  All Star and Betley use a variety of tactics to conceal the kickbacks, Kickback Agreement and All Star and MBA's coordinated relationship under the Kickback Agreement.

38.   Laundering the kickbacks through third party marketing companies is an integral part of the Kickback Agreement and allows All Star and Betley to conceal the fact and amount of kickbacks from borrowers, regulators and law enforcement. All Star and Betley launder the kickbacks through third party marketing companies to also conceal the fact that anything of value was exchanged between All Star, on the one hand, and Betley and MBA on the other.

39.   All Star and Betley launder the kickbacks through the third-party marketing companies to also conceal that the payments are kickbacks and to create the false impression that All Star is making payments for legitimate marketing services.

40.   To even further conceal the kickbacks and Kickback Agreement, All Star and Betley and MBA cause the third-party marketing company to create sham invoices to create the false impression that All Star is paying for, and receiving, legitimate marketing services from the third-party marketing company. In fact, All Star does not receive any legitimate marketing services from the marketing company and All Star's payment is applied solely for the benefit of Betley and those under Betley's direction at MBA.

41.   To add another layer of concealment, and to create the false impression that All Star and MBA are "co-marketing," All Star and  Betley agree to nominally include All Star on MBA direct mail solicitations to borrowers. These solicitations are a sham, and fraudulent, because MBA requires, and All Star agrees, to purposefully design the mailers to prevent borrowers from contacting All Star and to ensure the borrower will only contact MBA.

42.   For example, All Star and Betley intentionally design the mailers so that borrowers would contact only MBA. MBA chooses to omit any phone number, website, or contact information for All Star, and provides a phone number only for MBA to eliminate any chance that a borrower would contact All Star instead of MBA.

43.   The prototype for the "co-marketing" sham was developed by a postcard company contracted by All Star.  The postcard company advised:

> We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone number because we don't want people to call you instead of the mortgage company.

In 2010, All Star notified the postcard company, "We actually started a similar program with other direct mail companies and its [sic] going really really well."

44.   By design, All Star receives no actual marketing benefit from the solicitation and the entire marketing benefit flows to Betley and MBA. In exchange, under the Kickback Agreement, Betley and MBA agree and are required to select and refer to All Star for title and settlement services a minimum number of loans, including all loans generated by the mailer.  Despite the sham of including All Star in the mailer, the benefit All Star in fact receives is the referral from Betley and MBA.

45.   In addition, as advised by All Star's early prototype, All Sta and Betley agree to limit All Star to a negligible presence on the MBA borrower solicitation, with All Star occupying 1/5 or less of the surface area of a solicitation.  The payment made by All Star to Betley and MBA is far greater, and not reasonably related to All Star's nominal presence in the solicitations. Frankly, the inclusion of All Star on any material at all is solely for the purpose of attempting to conceal the kickbacks and trying to falsely claim "co-marketing."

46.   The sham solicitations live up to their intended purpose.  Despite making hundreds of thousands in payments to Betley and MBA, All Star does not receive any marketing benefit from the sham solicitations and not a single call from a borrower.  All of All Star's business

continues to flow from loans selected and referred from Betley and MBA and subject to the payment of kickbacks.

47.    The Consumer Financial Protection Board ("CFPB"), the federal agency responsible for RESPA enforcement, has identified that during the time period applicable to the Kickback Agreement and Scheme to Defraud, sham "co-marketing" was so prevalent as to cause the CFPB to issue a compliance bulletin concluding that "[b]ased on the Bureau's investigative efforts, it appears that many [marketing service agreements] are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees." Consumer Fin. Prot. Bureau Compliance Bulletin 2015-05, https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respa-compliance-and-marketing-services-agreements.pdf.

48.    In describing the type of agreements that were used as sham fronts for illegal kickbacks, the CFPB detailed a scheme indistinguishable from the one designed by All Star and MBA:

> [I[]n another matter that resulted in an enforcement action, **a title company entered into unwritten agreements with individual loan officers in which it paid for the referrals by defraying the loan officers' marketing expenses.** The title company supplied loan officers with valuable lead information and marketing materials. In exchange, the loan officers sent referrals to the title company. The lenders did not detect these RESPA violations and/or correct or prevent them, even when they had reason to know that the title company was defraying the marketing expenses of the lenders and their loan officers.

*Id.* (emphasis added).

49.    While building the sham of "co-marketing," All Star makes clear to Betley that the payment to Betley and MBA is solely for the selection and referral of loans for title and settlement services and attaches a production goal – sometimes referred to as a "unit goal" - to each

kickback paid to Betley and MBA. Ex. 4., Aug. 9, 2010 Letter from Betley to All Star dated August 9, 2010 and attached spreadsheet.

50.    In each instance and as part of the overall kickback agreement and scheme to defraud, the payments made by All Star which are laundered through third party marketing companies were express payments for the referral of borrowers by Betley and other MBA employees under Betley's direction to All Star and to conceal the illegal kickbacks, and not for the third-party marketing company's provision of any goods or services to All Star.

51.    In furtherance of the "co-marketing" sham integral to the Kickback Agreement, All Star is nominally included in the MBA borrower solicitations identified above and at other times not included. But, consistent with All Star's early prototypes, All Star is included in only a nominal way, if at all.

52.    True to its design and intent, All Star does not receive any marketing benefit from any MBA solicitation. Instead, borrowers contact MBA branch managers, loan officers and other employees, including Betley, who select and refer the MBA borrower's loan to All Star under the Kickback Agreement, pursuant to Betley's direction, and for the purpose of receiving the next kickback.

53.    From the very beginning, All Star's payments to Betley and MBA were for the selection and referral of loans for title and settlement services, and for no other purpose. For example, in November, 2009, All Star agreed to "match" MBA loan officer Brad Hyson's kickback agreement with another title company and pay Hyson a $200 kickback per loan selected and referred to All Star, only after asking: "How many deals do you think you can throw me a month?" The response:

| | |
|---|---|
| **From:** | Rob Selznick |
| **Sent:** | Friday, November 6, 2009 9:57 AM EST |
| **To:** | Brad Hyson |
| **Subject:** | Re: Hey Brad |

I will match the deal. Send any title requests directly to this email. Thanks for the opportunity.

Sent from my Verizon Wireless BlackBerry

**From:** "Brad Hyson" <bradhyson@yahoo.com>
**Date:** Fri, 6 Nov 2009 09:40:28 -0500
**To:** Rob Selznick<rob@allstartitleinc.com>
**Subject:** RE: Hey Brad

one maybe two

Brad Hyson
MBA Mortgage Services Inc.
Mortgage Banker
Phone 410-420-6621 ext 229
Fax 410-420-9967
bradhyson@yahoo.com

Ex. 5., Nov. 6, 2009 email from All Star marketing representative R. Selznick to B. Hyson.

54. The understanding that the kickbacks were for the selection and referral of loans – and not for any marketing benefit provided by MBA to All Star – continued under the Kickback Agreement applicable to all MBA offices, loan officers and employees. Shortly after the Kickback Agreement was formalized between Betley and All Star, Betley made clear to all MBA employees that the kickback payments were for the selection and referral of loans to All Star; therefore, all loans were required to go to All Star:

**From:** mikebetley@aol.com
**Date:** Fri, 15 Jan 2010 09:36:03 EST
**To:** <DEBBIEKURLIS@COMCAST.NET>; <mbetley@mbamortgage.net>;
<gfischer@mbamortgage.net>; <kellyannmurphy@verizon.net>; <tcollier@mbamortgage.net>;
<JohnDietz@TopProducer.com>; <jbarry@mbamortgage.net>; <dbetley@mbamortgage.net>;
<roberlander@mbamortgage.net>; <pmoscirella@mbamortgage.net>; <BradHyson@yahoo.com>;
<jortman009@aol.com>; <mbamsi@aol.com>; <liv4friday@aol.com>; <cfalk@mbamortgage.net>;
<philmoscirella@topproducer.com>; <richoberlander@hotmail.com>; <smorton@mbamortgage.net>;
<jcayo@mbamortgage.net>; <Daviddisciullo@mbamortgage.net>; <tmackenzie@mbamortgage.net>;
<arice@mbamortgage.net>; <rselznick@mbamortgage.net>; <Dvach@mbamortgage.net>;
<amaynard@mbamortgage.net>; <philcrouse@aol.com>; <jeffrey-russell@comcast.net>;
<pcrouse@mbamortgage.net>; <mstenger@mbamortgage.net>; <rweidman@mbamortgage.net>;
<pattyhomeloans@aol.com>; <nicky.d@comcast.net>; <bboyle@mbamortgage.net>;
<bfranz@mbamortgage.net>; <atsottles@mbamortgage.net>; <rthobe@mbamortgage.net>;
<lvaden@mbamortgage.net>; <aneale@mbamortgage.net>; <tstork@mbamortgage.net>;
<croberson@mbamortgage.net>; <lhanna@mbamortgage.net>; <dimason1987@aol.com>;
<todd.lubar@rockvillecharter.com>; <dvach@comcast.net>
**Cc:** <rob@allstartitleinc.com>
**Subject:** RE: Mailer Drop(s)

Loan Officers,

We will be making a mailer drop of approximately 30,000 pieces of mail in the next 4 weeks.  The first
drop will be today and the second drop will be February 8, 2010.  We have struck a deal with Allstar Title
to offset some of the expenses for each of these drops for January and February.  Since we have setup
this relationship for the next two months ALL loans that are generated through in-house marketing or
advertising MUST go to Allstar title.  If you do not want to send your loan through Allstar please give the
lead sheet to Mike or Dave and we will originate the loan on your behalf.  There are no exceptions and if
you have any questions please see Dave or Mike as soon as possible.  Thank you and good luck with
the mailer next week!!!

Mike

Ex. 1.

55.    Betley regularly reiterated his understanding that the kickback payments are in exchange

for the referral of loans, and not for any marketing benefit to All Star.  For example, in

2013, Betley agrees with All Star on the amount of kickback that MBA would receive each

month based on the number of loans that were selected and referred to All Star:

Rob,

You are correct, which is why I also copied Erin on the email.

What you have to realize is that 95% of all of Jen's loans were from MY marketing and several of Erin's loans were from my marketing as well, because she was the "early man in the office". So your numbers are skewed considerably. Regardless I can move the adjustments even higher for your convenience:

0-19     $4150

20-24    $5150

25+      $6150

However, I can not add any more to the fees on the individual loans. With increasing knowledge of the borrowers it is become very difficult to sell loans with any closing costs, let alone another increase. I have kept my fees at $595 and $395, even though my costs have tripled since 2007. The numbers above should more than compensate for the offset and we can certainly revisit in 3 months if I am not living up to my end of the deal. Please let me know if this is reasonable to you and Jason.

Mike

Ex. 6., Feb. 12, 2013 email from M. Betley to All Star marketing representative R. Selznick.

56.    Because there were no goods or facilities provided by MBA to All Star, and no services actually rendered by MBA to All Star, and all of the kickbacks were paid solely in exchange for the selection and referral of residential mortgage loans by MBA, none of the kickback payments are entitled to the protection of 12 U.S.C. §2607(c)2).

57.    In addition, and in the alternative, any payment from All Star to Betley or MBA is not reasonably related to the value of any purported good, facility or service that may have been provided by MBA to All Star.   All Star's presence in any individual MBA mailer, or collectively across all of the MBA mailers from the relevant time period, is not reasonably related to the hundreds of thousands in payments made by All Star to Betley or MBA under the Kickback Agreement.

58.    Because the payments by All Star are solely for the selection and referral of loans by Betley and MBA pursuant to the Kickback Scheme and/or not reasonably related to the value of

any purported good, facility or service provided to All Star by MBA, the payments are not entitled to the protection of 12 U.S.C. §2607(c)(2).

**III.** **Early in the performance of the Kickback Agreement, Betley and All Star form an association in fact enterprise and execute a scheme to defraud borrowers into paying fraudulent title and settlement service charges, using the U.S. mail in furtherance of the scheme to defraud, and committing more than 500,000 predicate acts over 5 years.**

59.    In November, 2009 shortly after the first kickback payment is made, Betley and All Star determine they need a way to pay for the cost of the kickbacks, and they conspire to and agree to defraud MBA borrowers into being charged and paying fraudulent and unnecessarily increased charges for title and settlement services on MBA loans ("Scheme to Defraud"). Ex. 7, Nov. 10, 2009 email from All Star marketing representative R. Selznick to Betley.

60.    All Star mocks up a generic HUD-1 with the fraudulent charges that Betley, MBA and All Star agree to charge MBA borrowers. Ex. 8., Mock-up of fraudulent HUD-1.

61.    The fraudulent charges include amounts not associated with any title or settlement service, despite being included in amounts for seemingly legitimate title and settlement services such as "title exam," "abstract," and "document preparation," and charged for the sole purpose of funding the illegal kickbacks. As All Star promises Betley, "I am shooting for like $1850 per deal and that would give you what we talked about on Friday."

62.    During the same time period, All Star communicates to other lenders participating in its kickback scheme that when it is not paying a lender kickbacks, All Star is willing to charge "$1000 including title" on a refinance transaction in a state in which All Star is licensed – All Star's "non-kickback pricing" for refinance transcations. When the lender is receiving kickbacks, All Star sets an increased charge for the same title and settlement services, to

account for the expense of the kickback that All Star is paying that lender. Ex. 9., Sept. 15, 2010 Email from R. Selznick.

63.  By January, 2010, MBA and All Star agree to allow All Star to charge MBA borrowers $1,750 including title insurance for each loan selected and referred under the kickback agreement. Ex. 10., Jan. 4, 2010 Title Fee Structure Sheet.

64.  These charges are at least $750 more than All Star's "non-kickback pricing." This is the Betley Overcharge, and the amount more that All Star is charging MBA borrowers because Betley is receiving and accepting kickbacks from All Star.

65.  Betley repeatedly admits that he understands that MBA borrowers are being charged and paying higher and unnecessarily increased title and settlement service charges because Betley is receiving and accepting kickbacks from All Star., Ex. 11., Email from Betley to All Star dated April 25, 2011 ; Ex. 12., Email between Betley, All Star, and MBA dated June 15, 2012  ; Ex. 13., Email from Betley to All Star dated February 11, 2013.

66.  The fixed and fraudulent charges Betley, MBA, and All Star agree to allow All Star to charge borrowers on MBA loans selected and referred under the Kickback Agreement include an unidentified amount not associated with any title or settlement service and charged for the sole purpose of paying for the kickbacks.

67.  For example, on May 19, 2011, Betley and All Star agree to increase the charges to MBA borrowers by $200 because Brad Hyson [MBA loan officer] is receiving an increased amount of kickbacks. Ex. 14.

68.  This amount constitutes the Kickback Overcharge and, together with the MBA Overcharge, constitute the minimum amount of actual damages caused by MBA's pattern of racketeering activity and incurred by borrowers on loans selected and referred by Betley and MBA to All Star during this time period

69.   Betley and MBA choose to reinvest and use the illegal kickbacks to produce and mail thousands of borrower solicitations; thereby generating the loans necessary to fulfill its obligations under the Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the Scheme to Defraud.

70.   Specifically, from 2009 through 2010, Betley and MBA choose to reinvest and use the kickbacks to finance the distribution of fraudulent solicitations, including:

   a.   14, 500 MBA solicitations on January 26, 2010;

   b.   43,500 MBA solicitation across February 2, 5, 15, 18, and 23, 2009;

   c.   3,500 MBA solicitations on or about March 2, 2010;

   d.   3,500 MBA solicitations on or about March 17, 2010;

   e.   5,000 MBA solicitation on or about March 23, 2010;

   f.   5,000 MBA solicitations on or about April 8, 2010;

   g.   5,000 MBA solicitations direct mailers on April 9, 2010;

   h.   50,000 MBA solicitations on or about April 22, 2010;

   i.   9,000 MBA solicitations on or about July 9, 2010;

   j.   6,000 MBA solicitations on or about September 3, 2010;

   k.   10,985 MBA solicitations on or about September 20, 2010;

   l.   4,000 MBA solicitations on or about September 20, 2010;

   m.   13,000 MBA solicitations on or about October 8, 2010;

   n.   6,620 MBA solicitations on or about October 19, 2010;

   o.   10,500 MBA solicitations on or about November 5, 2010; and

   p.   6,268 MBA solicitations on or about November 5, 2010.

71.   Each of these solicitations is sent through the U.S. mail for the purpose of and in furtherance of the scheme to defraud borrowers into paying fraudulent charges for title and

settlement services and is a predicate act of mail fraud for the purposes of 18 U.S.C. §1961(5).

72.    In March, 2010, Betley and All Star agree that that loans selected and referred to All Star by certain MBA loan officers will be "$1400 for FHA Streamlines, $1600 for VA Streamlines, and $2000 for Full Doc Loans."  These charges are $400-$1000 more than All Star's non-kickback pricing for the same settlements services, and is the MBA Overcharge applicable to MBA loans selected and referred to All Star during this time period.

73.    By August 2010, All Star and MBA agree to raise the fraudulent charges to borrowers on MBA loans from a minimum of $1,750 to a "minimum of $1850 including insurance but may be more depending on the loan" including "$1850 on streamlines and $2400 on full docs."   Aug. 3, 2010 Title Fee Structure Chart and associated e-mail; Aug. 12, 2010 E-mail between Betley and All Star; Oct., 2010, fee sheet.

74.    These fraudulent charges are at least $750-1400 higher than All Star's non-kickback pricing for the same title and settlement services and is the MBA Overcharge applicable to MBA loans selected and referred to All Star during this time period. Betley acknowledged that these prices "make[] Allstar quite a 'pretty penny' on [] streamlines" and rise to "almost double what some title companies are charging." Ex. 15., Aug. 12, 2010 E-mail between Betley and All Star.

75.    These fraudulent charges include at least $100 Kickback Overcharge that MBA and All Star are charging for the express purpose of funding the illegal kickbacks, and not associated with any legitimate title and settlement service.  This Kickback Overcharge, together with the MBA Overcharge, is the minimum amount of actual damages caused by

MBA's pattern of racketeering activity and incurred by borrowers on loans selected and referred by MBA to All Star during this time period. Ex. 15.

76. All Star admits in a December 30, 2010 e-mail, that the fraudulent charges are intended to increase the amount of fees All Star receives per loan and to pay for the kickbacks – the "[a]verage fee per loan was $1227 after the cost of marketing which is about $300 per loan less than where we want to be. Jason is in for doing these campaigns, but I think we need to bump the fees a hair." Ex. 16., Dec. 30, 2010 e-mails between All Star and Betley.

77. In 2011, Betley and MBA choose to continue to reinvest and use the illegal kickbacks in furtherance of the scheme to defraud, and to produce and mail thousands of borrower solicitations, thereby generating the loans necessary to fulfill its obligations under the Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the scheme to defraud.

78. Specifically, in 2011, Betley and MBA choose to reinvest and use the illegal kickbacks to produce and mail thousands of fraudulent solicitations, including:

    a.  3,001 MBA solicitations on or about January 6, 2011;

    b.  3,000 MBA solicitations on or about February 3, 2011;

    c.  12,500 MBA solicitations on or about March 2, 2011;

    d.  2,500 MBA solicitations on or about March 3, 2011;

    e.  6,470 MBA solicitations on or about April 1, 2011;

    f.  3,500 MBA solicitations on or about May 6, 2011;

    g.  5,000 MBA solicitations on or about May 24, 2011;

    h.  11,000 MBA solicitations on or about July 8, 2011;

    i.  9,375 MBA solicitations on or about August 3, 2011;

    j.  9,360 MBA solicitations on or about September 8, 2011;

k.  8,000 MBA solicitations on or about October 4, 2011;

l.  9,000 MBA solicitations on or about October 11, 2011;

m.  9,375 MBA solicitations on or about November 4, 2011;

n.  13,375 MBA solicitations on or about November 23, 2011;

o.  9,375 MBA solicitations on or about December 29, 2011.

79.  Each of these solicitations is sent through the U.S. mail for the purpose of and in furtherance of the scheme to defraud borrowers into paying fraudulent charges for title and settlement services and is a predicate act of mail fraud for the purposes of 18 U.S.C. §1961(5).

80.  In April, 2011, All Star's fee sheet memorializes the fraudulent charges All Star and MBA have agreed to allow All Star charge on MBA loans remain at $1,850 title for streamline loans and full docs fixed at $2,400.  In an email, Betley admits he has "no problem 'juicing'" borrowers on these loans. Ex. 11., Ex. 17., Apr. 27, 2011 Chart.

81.  In September 2011, All Star, Betley, and MBA agree to adjust the fraudulent charges on MBA loans to $1,650 including title for streamlines and conventional loans and $1,995 for "full docs, reverse[,] and all other loans." Ex. 18., Sept. 12, 2011 Title Fee Structure Chart.

82.  These fraudulent charges are between $650 – 995 higher than All Star's non-kickback pricing for the same title and settlement services. This MBA Overcharge, along with the Kickback Overcharge, is the minimum amount of actual damages caused by MBA's and Betley's pattern of racketeering activity and sustained by borrowers on loans selected and referred by MBA to All Star during this time period.

83.  In 2012, Betley and MBA choose to continue to reinvest and use the illegal kickbacks in furtherance of the Scheme to Defraud, and to produce and mail thousands of borrower solicitations; thereby generating the loans necessary to fulfill its obligations under the

Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the Scheme to Defraud.

84.    Specifically, in 2012, Betley and MBA reinvest and use the kickbacks to produce and mail thousands of fraudulent solicitations, including:

    a.   12,781 MBA solicitations on or about February 1, 2012;

    b.   12,500 MBA solicitations on or about on March 1, 2012;

    c.   12,500 MBA solicitations on or about March 29, 2012;

    d.   12,500 MBA solicitations on or about May 2, 2012;

    e.   5,000 MBA solicitations on or about May 7, 2012;

    f.   12,500 MBA solicitations on or about May 30, 2012;

    g.   12,500 MBA solicitations on or about July 2, 2012;

    h.   12,500 MBA solicitations on or about July 31, 2012;

    i.   3,000 MBA solicitations on or about August 10, 2012;

    j.   12,500 MBA solicitations on or about August 30, 2012;

    k.   12,500 MBA solicitations on or about September 26, 2012;

    l.   12,500 MBA solicitations on or about October 23, 2012;

    m.  4,000 MBA solicitations on or about November 13, 2012; and

    n.   10,500 MBA solicitations on or about December 20, 2012.

85.    Each of these solicitations is sent through the U.S. mail for the purpose of and in furtherance of the scheme to defraud borrowers into paying fraudulent charges for title and settlement services and is a predicate act of mail fraud for the purposes of 18 U.S.C. §1961(5).

86.    In June 2012, All Star and MBA agree to allow All Star to charge borrowers $100 more on loans in which All Star does an application signing.  This Application Signing Surcharge is not disclosed to borrowers. Ex. 12.

87.    In 2013, Betley and MBA choose to continue to reinvest and use the illegal kickbacks in furtherance of the Scheme to Defraud, and to produce and mail thousands of borrower solicitations; thereby generating the loans necessary to fulfill its obligations under the Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the Scheme to Defraud.

88.    Specifically, in 2013, Betley and MBA reinvest and use the kickbacks to produce and mail thousands of fraudulent MBA solicitations, including:

  a. 11,100 MBA solicitations on or about January 10, 2013;

  b. 4,500 MBA solicitations on or about February 12, 2013;

  c. 8,000 MBA solicitations on or about February 13, 2013;

  d. 3,230 MBA solicitations on or about February 19, 2013;

  e. 7,300 MBA solicitations on or about March 5, 2013;

  f. 8,000 MBA solicitations on or about March 6, 2013;

  g. 7,901 MBA solicitations on or about April 5, 2013;

  h. 3,000 MBA solicitations on or about April 9, 2013;

  i. 7,280 MBA solicitations on or about May 8, 2013;

  j. 3,000 MBA solicitations on or about May 8, 2013;

  k. 3,000 MBA solicitations on or about May 9, 2013;

  l. 4,991 MBA solicitations on or about May 9, 2013;

  m. 7,500 MBA solicitations on or about May 31, 2013;

  n. 7,368 MBA solicitations on or about July 1, 2013;

    o.  1,850 MBA solicitations on or about July 11, 2013;

    p.  1,861 MBA solicitations on or about July 17, 2013;

    q.  7,368 MBA solicitations on or about July 31, 2013;

    r.  7,280 MBA solicitations on or about September 18, 2013;

    s.  7,500 MBA solicitations on or about October 30, 2013.

89.    Each of these solicitations is sent through the U.S. mail for the purpose of and in furtherance of the scheme to defraud borrowers into paying fraudulent charges for title and settlement services and is a predicate act of mail fraud for the purposes of 18 U.S.C. §1961(5).

90.    In February 2013, MBA agrees to increase the fraudulent charges to borrowers on loan selected and referred from MBA loan officers Erin Lyles and Jen Hoy to "$1750 on FHA streamlines and $1900 on everything else." Ex. 19., Feb. 13, 2013 e-mail.

91.    These fraudulent charges are between $750-900 higher than All Star's non-kickback pricing for similar title and settlement services. These fraudulent prices also include an additional $100 Kickback Overcharge imposed for the sole purpose of funding kickbacks. This Kickback Overcharge, along with the MBA Overcharge, are the minimum amount of actual damages caused by the Scheme to Defraud, MBA's pattern of racketeering activity in furtherance, and incurred by MBA borrowers selected and referred by Lyles and Hoy during this time period.

92.    Also in February, 2013, Betley reiterates the "$1650 fee structure," and related MBA and Kickback Overcharges described above to MBA loans selected and referred to MBA in 2013. These are the minimum amount of actual damages caused by the Scheme to Defraud, MBA's pattern of racketeering activity, and incurred by borrowers selected and referred by MBA during this time period. Notably, Betley promises to select and refer even more

loans to All Star under the Kickback Agreement to receive even higher amounts of kickbacks. Ex. 20., Feb. 12, 2013 Email Correspondence between M. Betley and All Star marketing representative R. Selznick.

93.    In 2014, and into 2015, Betley and MBA choose to continue to reinvest and use the illegal kickbacks in furtherance of the Scheme to Defraud, and to produce and mail thousands of borrower solicitations; thereby generating the loans necessary to fulfill its obligations under the Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the Scheme to Defraud.

94.    Specifically, in 2014 through 2015, Betley and MBA reinvest the kickbacks and send fraudulent solicitations as follows:

   a.  1,000 MBA solicitations on or about November 7, 2014;

   b.  550 MBA solicitations on or about November 21, 2014;

   c.  550 MBA solicitations on or about February 18, 2015.

95.    Each of these solicitations is sent through the U.S. mail for the purpose of and in furtherance of the scheme to defraud borrowers into paying fraudulent charges for title and settlement services and is a predicate act of mail fraud for the purposes of 18 U.S.C. §1961(5).

96.    As of January 13, 2014, All Star and MBA maintained the fraudulent charges for streamlines and conventional loans at $1,650.00 and for "full docs, reverse[,] and all other loans" at $1,995.00. In addition, All Star and MBA altered the fixed prices charged for MBA loan officers Lyles and Hoy to "$1750.00 FHA, $1900.00 Others, and $1850.00 Atty". Jan. 13, 2014 Title Fee Structure Chart.

97.    These fraudulent charges include the MBA and Kickback Overcharges described above and are the minimum amount of actual damages caused by the Scheme to Defraud, MBA's

pattern of racketeering in furtherance thereof, and incurred by MBA borrowers selected and referred by MBA in this time period.

98.    All Star and MBA agree to charge MBA borrowers fraudulent charges for title and settlement services through at least 2015. Ex. 21., Nov. 4, 2015 Robs Client Fee Structure Chart.

### IV.    Through the Kickback Agreement and Scheme to Defraud, Betley and MBA cause Plaintiffs and the Alleged Class concrete and individualized harm.

99.    As a result of  MBA's performance of the Kickback Agreement, the Scheme to Defraud, and the pattern of racketeering activity MBA and All Star conduct in furtherance of the Scheme to Defraud,  MBA borrowers, including Plaintiff and alleged Class Members, are harmed because they are: (i) defrauded into being charged and paying amounts that are not related to any legitimate title and settlement services and for the purpose of funding illegal kickbacks; (ii) charged and pay higher and unnecessarily increased amounts for title and settlement services that they would have without the Kickback Agreement and/or the Scheme to Defraud; (iii) denied kickback free title and settlement services, and (iv) are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

### FACTUAL ALLEGATIONS RELATED TO
### THE INDIVIDUAL CLASS REPRESENTATIVES

100.    Plaintiff's transactions and the course of events thereafter exemplify the working of the Kickback Agreement and the Scheme to Defraud and are typical of all alleged Class Members' transactions.

### I.    Mr. McCarrell'sLoan

101.    In or about March 2015, Mr. McCarrell obtained a residential mortgage loan from MBA through Betley, acting as an MBA loan officer, in relation to the purchase of residential

real property and principal residence located at 346 Kendig Drive, Owings Mills, Maryland 21117. Mr. McCarrell's loan settled on March 30, 2015 with MBA as the lender.

102.    Betley selected and referred Mr. McCarrell's loan to All Star in performance of the Kickback Agreement and as quid pro quo for the $481.00 kickback All Star paid to and MBA received on February 18, 2015.

103.    In furtherance of the Kickback Agreement and Scheme to Defraud, All Star charged Mr. McCarrell $1,574.25 in total title and settlement service fees, thereby performing the Kickback Agreement. These title and settlement service fees included the MBA Overcharge and Kickback Overcharge described above and caused Mr. McCarrell actual damages resulting from the Kickback Agreement and Scheme to Defraud.

104.    Mr. McCarrell paid for these charges when All Star disbursed proceeds from Mr. McCarrell's loan in payment of these title and settlement service charges.

105.    Mr. McCarrell believes, and therefore avers, that MBA and Betley benefitted, and continue to benefit, from the fraudulent title and settlement service charges related to the Mr. McCarrell's loan because MBA financed the fees into their MBA loan and thereby earns interest on the fees.

106.    As a direct and proximate result of the Kickback Agreement and Scheme to Defraud and MBA's performance of the same, Mr. McCarrell was harmed because he was: (i) charged and paid unnecessarily increased and higher title and settlement services fees than he would have paid without the illegal Kickback Agreement, Scheme to Defraud, and the pattern of racketeering activity Betley, MBA and All Star conduct in furtherance of the Scheme to Defraud; (ii) was defrauded into being charged and paying higher prices for title and settlements service fees unnecessarily increased by amounts not associated with any legitimate title and settlement service and charged to fund illegal kickbacks; (iii) stripped

of his choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition n among independent title and settlement service providers.

107.    As a direct and proximate result of the Kickback Agreement and Scheme to Defraud, Mr. McCarrell was charged, and paid, more for the title and settlement services than he would have without the Kickback Agreement and Scheme to Defraud. He suffered actual damages in the amount of at least $574.20 and, on information and belief, additional amounts.

### II.    Daniel Schultz's Loan

108.    In or about November 2013, Mr. Schultz obtained a residential mortgage loan from MBA through Betley in relation to the refinancing of his residential real property and principal residence located at 20675 Cove Road, Bivalve, Maryland 21814. Mr. Schultz's loan settled on November 8, 2013 with MBA as the lender.

109.    Betley selected and referred Mr. Schultz's loan to All Star in performance of the Kickback Agreement and as quid pro quo for the $4,200 kickback All Star paid to and received by MBA on October 30, 2013, laundered by and through Lendanear.

110.     In furtherance of the Kickback Agreement and Scheme to Defraud, All Star charged Mr. Schultz $1,527.86 in total title and settlement service fees. These title and settlement service fees included the MBA Overcharge and Kickback Overcharge described above which represent actual damages resulting from the Kickback Agreement and Scheme to Defraud.

111.    Mr. Schultz paid for these charges when All Star disbursed proceeds from Mr. Schultz's loan in payment of these title and settlement service charges.

112.   Mr. Schultz believes, and therefore avers, that Betley and MBA benefitted, and continue to benefit, from the fraudulent title and settlement service charges related to Mr. Schultz's loan because MBA financed the fees into his MBA loan and thereby earns interest on the fees.

113.   As a direct and proximate result of the Kickback Agreement and scheme to defraud and MBA's performance of the same, Mr. Schultz was harmed because he was: (i) charged and paid unnecessarily increased and higher title and settlement services fees than he would have paid without the illegal Kickback Agreement, the Scheme to Defraud, and the pattern of racketeering activity Betley, MBA and All Star conduct in furtherance of the Scheme to Defraud; (ii) was defrauded into being charged and paying higher prices for title and settlements service fees unnecessarily increased by amounts not associated with any legitimate title and settlement service and to pay for illegal kickbacks; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

114.   As a direct and proximate result of the Kickback Agreement and Scheme to Defraud, Mr. Schultz was charged and paid more for the title and settlement services than she would have been without the Kickback Agreement and Scheme to Defraud. He suffered actual damages in the amount of at least $500 and, on information and belief, additional amounts.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

**I.     MBA and All Star fraudulently conceal the kickbacks, Kickback Agreement and Scheme to Defraud.**

115.    Concealment was essential to Betley's, MBA's and All Star's Kickback Agreement and Scheme to Defraud, and Betley, MBA, and All Star undertook affirmative acts that fraudulently concealed the Kickback Agreement and Scheme to Defraud, the resulting kickbacks and fraudulent title and settlement service charges, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

### A. All Star, Betley, and MBA launder kickbacks through third-party marketing companies and use sham invoice and payment records.

116.    As described above, Betley, MBA, and All Star chose to conceal the fact and payment of kickbacks by laundering kickbacks through third-party marketing companies.

117.    As described above, Betley, MBA, and All Star further chose to conceal the illegal kickbacks and Kickback Agreement through the creation of sham invoices and sham payment records.

118.    These sham invoices and payment records created an ongoing false record that concealed and prevented discovery of the fact that any thing of value was exchanged between MBA and Betley, on the one hand, and All Star on the other, related to the selection and referral of MBA loans, including Plaintiffs' loans; the actual payment, receipt, and acceptance of illegal kickbacks; and MBA's coordinated business relationship with All Star.

### B. MBA and All Star's fraudulent marketing representations.

119.    To further conceal the Kickback Agreement and Scheme to Defraud, and the resulting fraudulent and unnecessarily increased charges to MBA borrowers for title and settlement services, MBA and All Star made false representations to borrowers in marketing materials.

120.     In direct mail solicitations of borrowers, MBA represented that All Star had "competitive pricing", was a part of MBA's "experienced team of real estate professionals" and was "the number one choice of MBA Mortgage Services, Inc. clients."

121.     These representations were false because: (i) MBA did not have an employment or ownership relationship with All Star; (ii) a borrower would not save any percentage of title fees with All Star, but instead would be charged higher and fraudulent charges for title and settlement services; (iii) the MBA broker referred the borrower's loan to All Star to obtain kickbacks and perform its obligations under the Kickback Agreement, not so the borrower would receive lower prices; and (iv) any borrower responding to the direct mail solicitation would not "choose" All Star, but would be selected and referred by MBA to All Star and thereby would be required to use All Star.

122.     Plaintiffs believe, and therefore aver, that MBA made similar false representations by other means, *e.g.* as in telemarketing phone calls with borrowers.

### C.  MBA and All Star's false allocation of fees and APR manipulation.

123.     The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate ("APR") associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes the interest rate of the loan plus certain other lender fees, such as origination fees, discount points, and some closing costs, including some title and settlement services fees. The APR is intended to serve as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate. Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

124.    The title and settlement services fees excluded from the APR calculation are defined by
        TILA. 12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others
        are not), title and settlement service companies and lenders can manipulate – and falsely
        minimize – the APR by falsely allocating amounts charged for title and settlement services
        to those categories of fees excluded from the APR calculation.

125.    As a regular and continuing business practice, MBA and All Star allocated its charges for
        title and settlement services associated with a borrower's loan only to those categories of
        title services not included in the APR. This falsely minimized and represented the APR
        reported on MBA borrowers' loan documents and required federal disclosures.

126.    For example, "fees for title examination" and "abstract of title" are excluded from the APR
        calculation. *See* 12 C.F.R. § 1026.4(c)(7)(i). Meanwhile settlement or closing fees and
        application signing fees are settlement service costs required to be included in the APR
        calculation. *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated with
        conducting a settlement or closing with a borrower, or those charges associated with an
        application signing, to the category of "title exam" or "abstract," MBA and All Star falsely
        minimized and represented the APR.

127.    All Star claimed the false allocation of fees and manipulation of the APR as a regular
        business practice as early as 2011 and at least through October 2015, allocating all charges
        for title and settlement service to "Title Exam" or "Abstract" because those fees are
        excluded from, and do not raise, the APR. June 6, 2011 E-mail; September 24, 2015 E-
        mail l; October 6, 2015 E-mail.

128.    MBA ratified this false allocation of fees. May 21, 2013 E-mail. Based on this continuing
        pattern of practice, Plaintiffs believe, and therefore aver, that All Star and MBA engaged

in the false allocation and manipulation of the APR throughout the time period MBA participated in the All Star Scheme.

129.   For example, despite conducting a settlement or closing with each MBA borrower, All Star and MBA chose to not allocate any amount of All Star's charges associated with the types of fees required to be included in the APR, within the appropriate category. Instead, All Star and MBA allocated all charges, including portions attributable to conducting a settlement or closing, to "Title Exam" or "Abstract".

130.   In addition, despite conducting application signings with borrowers, MBA and All Star chose to not allocate any amount of All Star's charges associated with a borrower's loan to an application signing. Instead, All Star allocated all charges, including those attributable to conducting an application signing, to "Title Exam" or "Abstract" because, again, those fees are not included in and do not raise the APR.

131.   Because MBA and All Star chose to falsely allocate fees, the reported APR was false, which thereby falsely minimized the cost of the loan to MBA borrowers.

132.   MBA and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from MBA borrowers the fraudulent pricing of title and settlement services resulting from the Kickback Agreement and Scheme to Defraud and prevented borrowers from discovering the fraudulent nature of the charges through comparison to MBA's and All Star's competitors.

133.   As a regular business practice, All Star used various software programs, including "TitleHound," to produce borrower loan documents, including documents reporting the APR associated with a loan. All Star caused this software, including TitleHound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce MBA loan documents that were presented

to borrowers, which falsely allocated the title and settlement services fees and falsely represented the APR. Apr. 24-25, 2012 E-mails between All Star and TitleHound.

134.    Betley and MBA intended MBA borrowers to rely on these documents, and MBA borrowers did, in fact, rely on such documents as they had no reason to suspect MBA and All Star's illegal activities, and on which MBA and All Star intended borrowers rely. Apr. 24-25, 2012 E-mails between All Star and TitleHound.

135.    MBA and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed, from MBA borrowers, the coordinated business relationship between MBA and All Star under the Kickback Agreement and the Scheme to Defraud, the fraudulent and higher charges for title and settlement services resulting from the illegal Kickback Agreement and Scheme to Defraud, and the pattern of racketeering activity performed in furtherance of the Scheme to Defraud, affirmatively preventing MBA borrowers from discovering their injuries resulting therefrom.

### D.  False representations in MBA borrowers' loan documents.

136.    In addition to the false representations made in marketing communications to borrowers and the choice to misrepresent the actual APRs through the intentionally classifying some of All Star's charges as non-APR related charges, MBA and All Star also choose to make false representations on borrowers' loan documents.

137.    At all relevant times, federal law required MBA, as a lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b). "The required standardized GFE form must be prepared completely and accurately." 12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

138.   Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance."

139.   As a regular pattern of practice, Betley and MBA falsely included in Block 4 charges that were not title services and lender's title insurance including, the MBA Overcharge, Kickback Overcharge, and Application Signing Surcharge.

140.   Betley's and MBA's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate concealed from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fraudulent nature of the charges, (iii) the illegal kickbacks, (iv) the coordinated business relationship between MBA and All Star under the Kickback Agreement and Scheme to Defraud,  and (v) the pattern of racketeering activity performed in furtherance of the Scheme to Defraud.

141.   In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

142.   Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

143.   As a continuing pattern and regular business practice, MBA and All Star choose and cause the false allocation of fees describe above and caused the fees to repeat and appear on MBA borrowers' HUD-1 statements in Section 1100.

144.   As a continuing pattern and regular business practice, MBA omitted and failed to describe anywhere on a borrower's HUD-1 statement the existence and the amount of the kickback received by MBA related to the borrower's loan or the fact that All Star has paid a kickback

to MBA for the selection and referral of the borrower's loan.  MBA is required to report the kickback on Line 801 or Line 808 of the HUD-1.

145.    As a continuing pattern of practice, MBA omitted and failed to describe anywhere on a borrower's HUD-1 statement that the borrower was being charged a kickback or the amount of any MBA or Kickback Overcharge or Application Signing Surcharge. MBA was required to report these amounts in Section 1100 or Section 1300 of the HUD-1. Again, this act is fraudulent because these charges were unassociated with any legitimate title and settlement services and were charged solely for the purpose of paying for illegal kickbacks.

146.    These false representations and omissions, presented to MBA borrowers, at closing, by All Star as MBA's agent, fraudulently concealed: (i) the fact and amounts associated with the MBA and Kickback Overcharges, and Application Signing Surcharges, (ii) the fraudulent nature of the reported charges and the fact that portions of the charges reported for legitimate title and settlement service charges were not in fact associated with those services, but charges imposed to pay for illegal kickbacks, (iii) the illegal kickbacks, (iv) the coordinated business relationship between MBA and All Star under the Kickback Agreement, Scheme to Defraud, and (v) the pattern of racketeering activity performed in furtherance of the Scheme to Defraud.

147.    Individually and collectively, MBA and All Star's  affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, the false marketing statements, the false allocation of fees and manipulation of the reported APR, and the misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – were outside the control of MBA borrowers, including Plaintiffs and Class Members, and were in the sole control of, and the result of choices made by, Betley, MBA and All Star.

### II.      Plaintiffs' Reasonable Diligence.

148.   As a result of the fraudulent concealments by MBA and All Star, Mr. McCarrell and Mr. Schultz and, upon information and belief, all alleged Class Members, had no actual notice before, at, or after the closing of their MBA loans, of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Kickback Agreement or Scheme to Defraud, the resulting fraudulent nature of the charges for title and settlement services, the coordinated business relationship between MBA and All Star under the Kickback Agreement and the Scheme to Defraud.

149.   Plaintiffs exercised reasonable diligence before, during, and after the closing of their loans.

### A.      Mr. McCarrell's Reasonable Diligence

150.   As a result of the fraudulent concealments made by MBA and All Star, Mr. McCarrell had no actual notice before, at, or after the closing of his MBA loan, of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Kickback Agreement or Scheme to Defraud, the resulting fraudulent charges for title and settlement services, the coordinated business relationship of MBA or All Star under the Kickback Agreement and the Scheme to Defraud.

151.   Mr. McCarrell exercised reasonable diligence before, during, and after the closing of his loan.

152.   Mr. McCarrell received the loan documents prepared by MBA in advance of his closing and reviewed those loan documents.

153.   Mr. McCarrell believes, and therefore avers, that his pre-closing loan documents included the required "Good Faith" Estimate which he believes, and therefore avers, MBA prepared.

154.   Mr. McCarrell believes, and therefore avers, that his "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between

MBA and All Star, or the fact that All Star paid any thing of value for MBA's selection and referral of his loan to All Star.

155.   Mr. McCarrell believes, and therefore avers, that his "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star contains the fraudulent representations and omission described above. Mr. McCarrell believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to Mr. McCarrell's loan.

156.   Mr. McCarrell believes, and therefore avers, that his pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described above.

157.   The false statements and omissions made in Mr. McCarrell's pre-closing loan documents were made for the purposes of concealing, and did so conceal from him, the coordinated business relationship between MBA and All Star, the Kickback Agreement and the Scheme to Defraud, the fact, nature, and amount of the illegal kickbacks related to Mr. McCarrell's loan, and the fraudulent nature of charges the Mr. McCarrell was charged for title and settlement services.

158.   As is reasonable under the circumstances, Mr. McCarrell believed these pre-closing documents and the representations made therein. A reasonable borrower would have had no reason to believe, and Mr. McCarrell did not believe, that: (i) a coordinated business relationship existed between MBA and All Star; (ii) there had been any payment or exchange of a thing of value between MBA and All Star related to the selection and referral of their MBA loan for title and settlement services, or (iii) the charges for their title and

settlement services were fraudulent, and the result of Kickback Agreement, Scheme to Defraud  or  a pattern of racketeering activity in furtherance of a scheme to defraud.

159. Mr. McCarrell acted diligently during the closing or settlement of his loan. As a condition of funding his loan, MBA required Mr. McCarrell to participate in a closing. Mr. McCarrell did so attend and fully participated in the required closing.

160. Mr. McCarrell believes, and therefore avers, that at the closing of his loan, he received from All Star, and/or its agent, several documents, including a HUD-1 Settlement Statement.

161. The documents Mr. McCarrell received at his closing, including his HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under the Kickback Agreement and the Scheme to Defraud

162. The documents Mr. McCarrell received at his closing, including their HUD-1, do not contain a description or statement of any payment, amount, or thing of value that All Star paid to MBA in relation to his MBA loan.

163. The documents Mr. McCarrell received at his closing, including his HUD-1, contain and reflect the false allocation of fees as described above.

164. The documents Mr. McCarrell received at his closing, including his HUD-1, contain the false representations and omissions described above.

165. The false representations and omissions in Mr. McCarrell's loan closing documents were made for the purposes of concealing, and did so conceal from him, the coordinated business relationship between MBA and All Star, the Kickback Agreement and Scheme to Defraud, the fact, nature, and amount of the illegal kickback related to their MBA loan, the fraudulent nature of the charges for title and settlement services, and Mr. McCarrell's injuries and actual damages resulting therefrom.

166. As is reasonable under the circumstances, Mr. McCarrell believed these closing documents and the representations made therein. A reasonable borrower would have had no reason to believe, and Mr. McCarrell did not believe, that: (i) a coordinated business relationship existed between MBA and All Star, (ii) there had been any payment or exchange of a thing of value between MBA and All Star related to the selection and referral of their MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services were fraudulent and the result of a Kickback Agreement and Scheme to Defraud between MBA and All Star.

167. Mr. McCarrell acted diligently after their closing. Sometime after June 28, 2022, Mr. McCarrell received a letter from undersigned counsel describing an investigation of All Star and MBA. This was Mr. McCarrell's first indication of any potential wrongful, illegal, harmful, and/or actionable conduct by anyone related to their MBA loan.

168. Within days Mr. McCarrell contacted, and later retained, counsel. Mr. McCarrell filed the original Complaint within one year of becoming aware of the facts giving rise to his causes of action, injuries, and actual damages.

169. As a result of MBA and All Star's fraudulent concealment, and Mr. McCarrell's reasonable diligence before, during, and after the closing of his loan, the statute of limitations on all of his claims were tolled beginning on the date of his loan closing and continuing until Mr. McCarrell learned of the facts giving rise to his causes of action, sometime after June 28, 2022.

### B.    Mr. Schultz's Reasonable Diligence

170. As a result of the fraudulent concealments by MBA and All Star, Mr. Schultz had no actual notice before, at, or after the closing of his MBA loan, of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Kickback Agreement or

Scheme to Defraud, the resulting fraudulent nature of the prices charged for title and settlement services, the coordinated business relationship of MBA or All Star under the Kickback Agreement and Scheme to Defraud, or the pattern of racketeering performed by MBA and All Star in furtherance of the Scheme to Defraud.

171.    Mr. Schultz exercised reasonable diligence before, during, and after the closing of his loan.

172.    Mr. Schultz received the loan documents prepared by MBA in advance of his closing and reviewed those loan documents.

173.    Mr. Schultz believes, and therefore avers, that his pre-closing loan documents included his "Good Faith" Estimate which his believes, and therefore avers, MBA prepared.

174.    Mr. Schultz's "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star paid anything of value for MBA's selection and referral of Mr. Schultz's loan to All Star.

175.    Mr. Schultz's "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star but does contain the fraudulent representations and omissions described above. Mr. Schultz believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to Mr. Schultz's refinance.

176.    Mr. Schultz's pre-closing loan documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described above.

177.    The false statements and omissions made in Mr. Schultz's pre-closing loan documents were made for the purposes of concealing, and did so conceal from Mr. Schultz the coordinated business relationship between MBA and All Star, the Kickback Agreement and Scheme to Defraud, the fact, nature, and amount of the illegal kickbacks related to Mr. Schultz's loan,

and the fraudulent nature of the charges Mr. Schutlz was charged for title and settlement services.

178.    As is reasonable under the circumstances, Mr. Schultz believed these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Mr. Schultz did not believe at the time he received his pre-closing documents, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there had been any payment or exchange of a thing of value between MBA and All Star related to the selection and referral of her MBA loan for title and settlement services, (iii) the prices he would be charged for title and settlement services were fraudulent , and the result of the Kickback Agreement and Scheme to Defraud.

179.    Mr. Schultz acted diligently during the closing or settlement of his loan. As a condition of funding his loan, MBA required Mr. Schultz to participate in a closing. Mr. Schutlz did so attend and fully participated in the required closing.

180.    At the closing of his loan, Mr. Schultz received from All Star, and/or its agent, several documents, including a HUD-1 Settlement Statement.

181.    The documents Mr. Schultz received at his closing, including his HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under the Kickback Agreement or Scheme to Defraud.

182.    The documents Mr. Schultz received at his closing, including his HUD-1, do not contain a description or statement of any payment, amount, or thing of value that All Star paid to MBA related to his loan.

183.    The documents Mr. Schultz received at his closing, including his HUD-1, contain and reflect the false allocation of fees as described above.

184.    The documents Mr. Schultz received at his closing, including his HUD-1, contain the false representations and omissions described above.

185.    The false representations and omissions in Mr. Schultz's loan closing documents were made for the purposes of concealing, and did so conceal from his, the coordinated business relationship between MBA and All Star, the Kickback Agreement and Scheme to Defraud, the fact, nature, and amount of the illegal kickback related to Mr. Schultz's loan, the fraudulent nature of the charges he was charged for title and settlement services and Mr. Schultz's injuries and actual damages resulting therefrom.

186.    As is reasonable under the circumstances, Mr. Schultz's believed these closing documents and the representations made therein. A reasonable borrower would have had no reason to believe, and Mr. Schultz did not believe at the time of his closing, that: (i) a coordinated business relationship existed between MBA and All Star, (ii) there had been any payment or exchange of a thing of value between MBA and All Star related to the selection and referral of his MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services were fraudulent and the result of Kickback Agreement and Scheme to Defraud between MBA and All Star.

187.    Mr. Schultz acted diligently after his closing. Sometime after June 28, 2022, Mr. Schultz received a letter from undersigned counsel describing an investigation of All Star and MBA. This was Mr. Schultz's first indication of any potential wrongful, illegal, harmful, and/or actionable conduct by anyone related to his MBA loan.

188.    Shortly thereafter Mr. Schultz contacted and retained counsel. Mr. Schultz filed the original Complaint within one year of becoming aware of the facts giving rise to his causes of action, injuries, and actual damages.

189.    As a result of MBA and All Star's fraudulent concealment, and Mr. Schultz's reasonable diligence before, during, and after the closing of his loan, the statute of limitations on all of his claims were tolled beginning on the date of his loan closing and continuing until Mr. Schultz learned of the facts giving rise to his causes of action, sometime after November 20, 2023.

### III.    Accrual and Tolling of Limitations

190.    The limitations period provided in 15 U.S.C. § 15(b), applicable to claims brought pursuant to 18 U.S.C. § 1964, is subject to the discovery of injury rule. *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626. Betley's and MBA's affirmative concealment acts precluded MBA borrowers, including Plaintiffs and Class Members, from discovering the fraudulent nature of the charges for title and settlement services, and affirmatively prevented MBA borrowers, including Plaintiffs and Class Members, from discovering their injuries resulting therefrom.

191.    As a result, Plaintiffs' and Class Members' claims, pursuant to 18 U.S.C. § 1964, did not accrue, for the purpose of the limitations period provided in 15 U.SC. § 15(b), until such time as Plaintiffs and Class Members knew, or should have known, of their injury – after June 28, 2022 for Mr. McCarrell and after November 20, 2023 for Mr. Schultz,.

192.    In addition and in the alternative, as a result of Betley's, MBA's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during, and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of Plaintiffs' loan closings and continuing until the Plaintiffs learned of the facts giving rise to the causes of action pled herein: after June 28, 2022 for Mr. McCarrell and after November 20, 2023 for Mr. Schultz,.

193.    Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback Agreement and Scheme to Defraud and are typical of all alleged Class Members' transactions, such that all Class Members are entitled to fraudulent concealment tolling of applicable limitations period.

### COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 
### 12 U.S.C. § 2607(a)

194.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

195.    All transactions at issue in the instant complaint are incident to, or part of, real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

196.    Betley, personally and by and through MBA, its mortgage brokers, loan officers, employees, and/or agents received and accepted things of value paid by All Star in exchange for the selection and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

197.    All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole, or in part, by MBA and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

198.    The payment and/or arranging of payment of kickbacks to Betley and MBA by All Star and Betley's and MBA's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

199.    The payments from All Star to Betley and MBA were not associated with any goods, facilities, or services actually provided by Betley or MBA, or any of MBA's agents and/or

employees, to All Star. In addition or in the alternative, the value of any good, facility, or service claimed to be provided by Betley or MBA to All Star was not reasonably related to the payment from All Star such that the payment is not "bona fide" or within the protection of 12 U.S.C. §2607(c)(2).

200.    In addition, All Star's laundering of money through the third-party marketing companies was always payments to Betley and MBA for the selection and referral of MBA loans to All Star, rather than for goods given to, or services performed for, All Star.

201.    In the alternative, any payment made by All Star to Betley and MBA and/or laundered through any third-party marketing company was far greater, and not reasonably related, to All Star's nominal presence in the solicitations and were, in reality, kickbacks designed to look like legitimate payments.

202.    Plaintiffs allege claims for violations of 12 U.S.C. § 2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by MBA Mortgage Service, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between July 1, 2009 and December 31, 2015. Exempted from this class is any person who, during the period of July 1, 2009 through December 31, 2015, was an employee, officer, member and/or agent of MBA Mortgage Services, Inc. or All Star Title, Inc.

(the "RESPA Class").

203.    There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a.  Whether there existed a referral agreement between Betley, on the one hand, and All Star on the other, whereby Betley agreed to select and refer MBA loans, refinances, and reverse mortgages to All Star in exchange for kickbacks;

b.  Whether Betley, MBA and MBA's employees and/or agents received illegal kickbacks from All Star for the selection and referral of business to All Star;

c.  Whether the illegal kickbacks to Betley, MBA and its employees and/or agents violated RESPA;

d.  Whether Betley and All Star used third-party marketing companies to launder kickbacks related to MBA loans;

e.  Whether Plaintiffs and RESPA Class Members were forced to pay higher and fraudulent charges for said settlement services;

f.  Whether Betley and MBA used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt, and acceptance of illegal kickbacks;

g.  Whether Betley and MBA disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between MBA and All Star related to any borrower's loan;

h.  Whether Betley and MBA disclosed or described on any borrowers "Good Faith" Estimate, HUD-1, and/or other loan document that MBA had a coordinated business relationship with All Star or the fact that a thing of value had been exchanged between MBA and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.   Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.   Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

204.   These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

205.   Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

206.   Plaintiffs will fairly and adequately protect the interests of the RESPA Class because the Plaintiffs' interests are identical to the interests of all other members of the RESPA Class.

207.   Plaintiffs' counsel have substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

208.   The RESPA Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

209.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Betley and MBA.

210.   This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only the individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

211.    Most members of the RESPA Class are unaware of their rights to prosecute a claim against Betley.

212.    No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23.

**COUNT II**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO),**
**18 U.S.C. § 1962**

213.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

214.    Betley is a "person" as defined under 18 U.S.C. § 1961(3) and for purposes of 18 U.S.C. § 1962(a).

215.    MBA, Betley and All Star associated in fact and form an enterprise for the purpose of 18 U.S.C. § 1962(a). For a continuous period of at least five years, Betley, MBA and All Star associated and committed the predicate acts pled herein, which are separate and in addition to their legitimate mortgage and settlement service operations, for the common purpose of defrauding borrowers into paying higher and fraudulent charges for title and settlement services. The activities of the enterprise affect interstate commerce across more than thirty states.

216.    MBA, Betley and All Star associate and perpetrate the enterprise for the purpose of defrauding borrowers into paying fixed and higher prices for title and settlement services related to MBA loans, and to pay amounts not associated with any legitimate title or settlement services and to thereby deprive borrowers of their money and/or property.

217.    The use of the interstate U.S. Mail and wires by Betley, MBA and All Star in furtherance of the Scheme to Defraud constitute mail and wire fraud as defined under 18 U.S.C. §§ 1341 and 1343, serve as predicate acts, and constitute a pattern of racketeering activity.

218. Betley and MBA received income derived directly and/or indirectly from this pattern of racketeering activity in the form of the kickbacks paid by All Star to Betley and MBA, and through the interest, fees and other income earned on MBA mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

219. Betley and MBA improperly used and reinvested the income he received from the pattern of racketeering activity in furtherance of the activities of the enterprise and for the purpose of luring borrowers into the Scheme to Defraud in violation of 18 U.S.C. § 1962(a).

220. As a direct and proximate result of Betley's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $500.

221. Plaintiffs allege claims pursuant to 18 U.S.C. § 1964(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or brokered by MBA Mortgage Services, Inc., for which All Star Title, Inc., provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between July 1, 2009 and December 31, 2017. Exempted from this class is any person who, during the period of July 1, 2009 through December 31, 2017, was an employee, officer, member and/or agent of MBA Mortgage Services, Inc. or All Star Title, Inc.

222. The RICO Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

223. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

    a. Whether Betley, MBA and MBA's employees and/or agents violated RICO by defrauding borrowers, including Plaintiff and RICO Class Members, into paying

fraudulent charges for title and settlement services and to fund the kickbacks All Star is paying MBA;

b.  Whether Betley, MBA and All Star formed an enterprise;

c.  Whether the activities of the enterprise affected interstate commerce;

d.  Whether one purpose of the Scheme to Defraud was to deprive borrowers of money or property;

e.  Whether Betley, MBA, and All Star used the interstate U.S. Mail in furtherance of the Scheme to Defraud and the activities of the enterprise;

f.  Whether Betley, MBA, and All Star used the interstate wires in furtherance of the Scheme to Defraud and the activities of the enterprise;

g.  Whether Betley and MBA received income from a pattern of racketeering activity;

h.  Whether Betley and MBA used income derived from a pattern of racketeering activity in support of, or in furtherance of, the Scheme to Defraud and the activities of enterprise;

i.  Whether Betley and MBA actively concealed the Scheme to Defraud, the resulting fraudulent charges for title and settlement services and the Scheme to Defraud and the activities of the enterprise;

j.  Whether Plaintiffs and RICO Class members knew or should have known of their injuries resulting from MBA's violation of 18 U.S.C. § 1962(a);

k.  Whether Betley's, MBA's, and All Star's fraudulent concealments prevented Plaintiffs and RICO Class Members from discovering their injuries proximately caused by the MBA's pattern of racketeering activity;

l.  Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

m.  Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

224.    These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

225.    Plaintiff's transaction and claims are typical of the claims or defenses of the respective RICO Class Members and are entitled to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

226.    Plaintiffs will fairly and adequately protect the interests of the RICO Class because the interests of the named Plaintiffs and all other members of the RICO Class are identical.

227.    Plaintiffs' counsel have substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

228.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Betley and MBA.

229.    This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only the individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

230.    Most members of the RICO Class are unaware of their rights to prosecute a claim against Betley.

231.    No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23

**WHEREFORE**, Plaintiffs respectfully demand:

a. This Court to certify the RESPA and/or RICO Classes pursuant to Fed. R. Civ. P. 23 and set this matter for trial;

b. Judgment for Plaintiffs and RESPA Class Members against Michael P. Betley and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c. Judgment for Plaintiffs and RICO Class Members against Michael P. Betley and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the Scheme to Defraud and pattern of racketeering activity, pursuant to 18 U.S.C. § 1964(c);

d. Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5) and/or 18 U.S.C. § 1964(c); and

e. For such other and further relief as this Court deems proper.

Dated: October 17, 2024                         Respectfully submitted,


_____/s/_____         _____/s/_____
Timothy F. Maloney, Esq.                      Michael Paul Smith, Esq.
Veronica B. Nannis, Esq                        Melissa L. English, Esq
Joseph, Greenwald & Laake, P.A.         Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                       600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                   Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)   (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                             menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*


## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Second

Amended Class Action Complaint.


_____/s/_____         _____/s/_____
Timothy F. Maloney, Esq.                      Michael Paul Smith, Esq.
Veronica B. Nannis, Esq 0212170116Joseph,   Melissa L. English, Esq.
Greenwald & Laake, P.A.                      Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                       600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                   Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)   (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                             menglish@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*

58

## CERTIFICATE OF SERVICE

I hereby certify, on this 17th day of October 2024, that the foregoing was served via this Court's CM/ECF system to counsel of record for the parties.

_____/s/_____
Melissa L. English, #19864